## ATTACHMENTS 1–2 — DEFENDANT'S ORIGINAL WRITING

The following text is reproduced from the original source document. The ChatGPT Library sharing URL has been omitted; no substantive text is rewritten.

**To the honorable Judge Liebowitz,**

Beginning this, I would like to extend my apologies for filing this late. I am not a lawyer in the state of Florida or directly know any lawyers in Florida, which makes communication on my end slow. There also is a very extensive cost to obtain a lawyer, where quotes have ranged from $7-18,000 just to get represented just as a start. That at this moment would be committing 30-70% of my monthly income into this while I have a mortgage and business to support as well as other family responsibilities. I also don't believe this case should justify any expense on my end, because this entire case is built off a scam by Daniel Desouza, who writing to you today I can say I've provided information exposing him and his practice, while validating everything he said I defamed him for as true.

I am a journalist. I reach millions of people everyday and it's a passion of mine to bring facts to my audience daily. I knew entering this case to respond to everyone, I couldn't at this moment hire a lawyer, but I could bring my skills of investigation in to prove my points on Dan Desouza and CopyCat Legal. I decided to call up their firm under an alternative number recently, where I claimed I was a potential client named Chris and spoke to a sales rep for them. The sales rep not only admitted to the things I said in my initial video were likely wrong with the firm, but so much more now that I'm seeking actions to report Daniel Desouza to the Florida state bar and send information to lawyers and people he's sued to get evidence away from their firm.

In the call they admitted to the following…

- No calculation. They on the record said they don't calculate damages based on the actual impact of what they do, but seek settlements based on a person's means, insurance and acknowledge they just send everyone these massive $30,000 settlement letters per claim, not actually weighing damages.
- Honeypot willingness. Dan said his practice doesn't work with clients known for honeypots, making that a point of defamation in my video. In my call, when asked about honey pots, the sales rep was completely fine with using them and said the practice is aware that most of their clients are accused of that.
- Admission of failure rate. Dan Desouza in his defamation case against me accused me of only making my TikTok video to try and stop his lawsuit against me for copyright claims. In the call, his sales rep acknowledged that half of the settlement letters sent never go anywhere due to not being worth it and when asked about 95%+ of them going nowhere, she didn't deny it.
- Failure to backup settlement and lawsuit threats. The sales rep when asked on what the largest settlement was in the last 3 years couldn't name it. When asked if anything was over $100,000, she responded potentially, but couldn't confirm and acknowledged likely no case went over $100,000. This points to a rogue lie, where the firm in many cases like mine is threatening

$250,000+ lawsuits, while having none to backup. I mentioned this in my video, Dan sued me for defamation over it and the firm admitted it.

Those four points are a handful that point out to the poor conduct of Dan Desouza as a lawyer, where his practice operates as a settlement machine for clients, doing no real calculation on damages, having questionable tactics to get people sued in the first place and to their own admission, they don't weigh damages, but just weigh the wallet of who they sue basing settlements purely off that.

My conduct hasn't been the most professional. For that, I ask forgiveness from the court, but please note in my situation, I am a content creator and aspiring entrepreneur who is currently the victim of one of many many SCAMS Dan Desouza operates.

I used the first amendment to discuss issues in the copyright court and used Daniel Desouza's practice to discuss absurd things happening there and potentially shady firms.

I have not cost Dan's business $1 in real revenue, but he continues to make absurd claims to the court, claiming 1.5+ million in business damages and $750,000+ in mental health damages, despite no evidence of seeking therapy, taking a single day off work or having any major changes in the business. Which even if I did cost him business, it is well within my right, because consequence of actions and the reporting of the actions do exist. In this case though, no notable damages can be made, but he disrespects this court, myself and people with actual mental damages, lying under this claim of $750,000 in mental distress, despite not showing any proof of suffering, $1 lost or even a day taken off over his normal schedule.

I believe I did the right thing for many content creators, business owners and other groups that are getting letters by firms such as Dan's and being threatened with these massive lawsuit threats, but aren't getting the proper information in who is behind them and the unfair and unethical tactics they used. I provided that information, will continue to provide it and will keep doing it.

At this point, I will be providing some motions to the court, but also going to ask for four things.

- The dismissal of this scam case. It was a scam copyright case he pursued against me he never continued in the first place, like the thousands of others yearly he doesn't pursue. It was a scam lawsuit, where I had free speech rights, never lied about him and he chose to sue to suppress future claims and others exposing him. It has been a scam lawsuit, where I am an out of state person and Dan continues disrespecting this court asking for absurd damage requests from me and gives no evidence on claims like mental distress, where he is blatantly lying to the court to fill his case.
- A chance to talk to the judge or people working for him. Writing this, I will acknowledge I am a legal amateur and do not know the process. I do however know that if there was a 30 minute conference call via video with myself, Daniel Desouza and someone else representing the judge,

this case would get dismissed instantly. I would like a call of that nature to happen, because it can clear many things up and end this.

- The reading of the transcript. If the court reads the transcript of the conversation with Dan's team, they will see some strongly questionable actions from his firm as well as most of if not all of my claims in my previous videos proven.
- Reading my responses to Dan's claims. I have compiled a list of Dan's claims against me in his original defamation case and I am going against them one by one, explaining how I am either correct or these were protected under the first amendment.

I thank the judge and any members of his team for reading and hopefully allowing me the opportunity to continue. I also want to say I apologize for conduct in the past in this case, but in honesty, I don't fully understand everything going on. The reason I didn't know how to respond to the first summons was I thought that was connected to the first case with copyright, but when I saw that wasn't continued, I assumed both cases were. I also got on a phone call with Daniel Desouza, where he explained I just had a simple response to agree on schedule and we could continue this later in the year, but clearly either I misunderstood or he intentionally didn't explain well. I'm also once again not a Floridian, not in a position where hiring a lawyer for a case with this little merit is feasible and I'm just a one man business trying to grow. I just seek forgiveness from the court for mistakes, but again, with looking at the new evidence, new counters by me directly and perhaps the chance for both Daniel Desouza and myself to stand directly before someone in the court virtually, things can be figured out quickly and we could all have our time saved pre holiday season and enjoy ourselves more.

Also, while nothing I am writing is done with Ai, I am using ChatGPT to help assemble responses and understand what is going on. This isn't a disrespect to the court and I apologize for it, but I am just one person dealing with a visible scam lawsuit from a very shady and insecure little man who should be disbarred for a variety of things. This is also time I could be putting into my business, family or friendships, where I am currently working long weeks and don't have time to deal with the pettiness of a lawyer who doesn't want his business exposed for the truth. So I apologize ahead of time for small mistakes the court will likely get, but no they are only here due to this case in itself being the mistake of the fraud and lies that are Dan Desouza and copycat legal.

Best,

Charles

**The copyright dispute and your response**

Claim 1 — You used at least 14 photos from their client as thumbnails or covers for monetized videos. (¶¶ 18–20)

Response

This did happen. He sent me a letter giving me the "opportunity" to avoid getting sued for $500,000+ if I took his "deal" of $280,000. I was protected under fair use, which is why that case never continued. Also, since talking to his firm in my call investigating them, they admitted to not pursuing over half the settlement letters they send, never getting a settlement case over $100,000 in the last 3 years and I knew right away the case was nonsense, not even believing it was a real firm at first.

Claim 2 — They sent you a March 17 letter demanding that you stop using the photos and proposing a settlement. (¶ 21)

Response

They sent the letter, but I knew it was nonsense and chose to say the firm was a grift, where before responding I looked them up and found no case they were involved with touching close to the $280,000 they asked for. When I got on the phone with Dan Desouza, I brought this up and he bragged he won a case for $207,000, sending me his clients information via email to gloat after the call. He won his client $10,000 and sued got $197,000 in loser pays, showing to my initial points that he wins little for his clients and his business model is centered more around loser pays, which I mentioned.

It should also be noted that Dan didn't act very professional in this process, where when I emailed him a photo of my middle finger, he responded I had gross nails that looked like I didn't cut them in weeks. He also in our first call mocked my career as a tiktoker, implying I was wasting my life, which that and him literally providing me information was why I did my initial video.

Claim 3 — You told them the videos would stay up and that you would use the photos again. (¶ 22)

Response

Yes I did and would do it again. He never even continued to represent his client on the case and abandoned it, because he always had an extremely weak case with fair use laws being on my side.

Claim 4 — You sent at least a dozen follow-up emails and made several calls. (¶ 23)

Response

I did. I was being threatened for $280,000 if not more and wanted every piece of information I could extract from them. I also had questions on their practice in the fear they were doing this to countless other people.

I would gladly send 1,000 emails to get to the bottom of it, where when there's a suspect of a scam, people should inquire on it instead of ignoring.

Claim 5 — You insulted an employee and asked the receptionist to pass along the insult. (¶ 24)

Response

I have every right in the world to call his staff what I wish. I got a spam email that would have never went anywhere if I didn't respond like to his firms admission 50%+ of the settlement letters they send. This isn't defamation at all and I have no idea why me being mildly rude to an employee is worth mentioning.

Also on this one, Dan is visibly lying. He's making this claim I called a member of his staff the C word in away to go against my character. I didn't directly call her that. She ended the call and I was still on the line and when I thought she was gone, I said "What a c***". If she was still present, I wouldn't have said it out of respect for a woman, but Dan just listened to the recording. He still has it and can provide it to the judge to prove my point.

Claim 6 — You referred to yourself as Dan's "master." (¶ 24)

Response

I called Dan my dancing monkey, said I was his master and told him to get ready to work at McDonald's. My only regret to this is I insulted McDonald's employees, monkeys and my own standards of who I'm master to, thinking I'd actually want Dan.

This has nothing to do with defamation and after being hit with a spam settlement lawsuit for over $250,000 and having Dan insult my career, I just was angry. This has nothing to do with defamation, mental distress or anything he claimed. He also insulted me numerous times in emails and in the initial call as well.

Claim 7 — You threatened to investigate them and publish videos if their client pursued the copyright claim. (¶ 24)

Response

Correct! I did say if the case was continued, I would seek investigation and detail the process to my audience on any shady or potentially unethical behavior I found with the firm. If I am being sued, it is smart practice to investigate who is doing it. Also as a content creator with 2+ million followers, I share many parts of my business and personal life with my audience, where I've done things as far to document my process of freezing sperm to the public. This was no difference.

I also said I would continue regardless of what he did in the call, so it wasn't a matter of me doing a video regardless of it continuing or not, but instead just something I was going to do the moment I saw the email asking for $280,000 and how shady the practice was off the research I did.

Claim 8 — You published the video to pressure them after your calls and emails failed to stop the copyright matter. (¶ 25)

Response

False! I make over 1,000 videos every year and have in my career as a creator done over 8,000 videos total covering a variety of topics. The video was perfect content and a story I felt I can help educate the public. We see these practices like Dan's sending out these letters asking for large money sums, but research shows the numbers they get aren't even 10% of the settlement amounts, various complaints firms are invovled in honey pot operations to try and target people and a massive confusion on how to fight back or even just ignore the case.

My focus wasn't to use a video to stop a lawsuit, because I knew that case would likely never continue, which matches the claims found in the audio with Dan's salesperson, where she said the vast majority of settlement letters never go anywhere.

I did this to investigate, research and report to a large audience of people so they know what to do if they ever get a letter like this or know what issues to bring up to their politicians in legal reform.

**The March 18 video**

Claim 9 — You posted the video on social media and used pictures of Dan and his staff. (¶¶ 26–27)

Response

These were public photos he used to market his firm on a public instagram, where he has run ads under it before and made videos of him reporting himself as an expert in the copyright industry. These photos used of him and his staff were to help tell a story on what was going on in this firm and were already public with marketing material and never attempted to make private.

Nothing harassing or defamatory was used with these photos and any commentary made on them was the price of him putting them on instagram, where the comments and settings were all public, implying he doesn't wish to hide anything or any public judgement.

Claim 10 — You said Dan was trying to sue you for $280,000. (¶ 28)

Response

I said that, because he was. He sent me a letter for $280,000 as his legal settlement and the potential of a $500,000+ lawsuit. His firm also works in a model, where they don't charge upfront fees to clients and take 45%, so in this case if I settled, he'd have gotten over $100,000 personally. The firm itself also handles all settlements using software to find potential people to sue/send settlement claims to and it's not clear if his client was even aware I existed with the volume of settlement cases they send for people.

This isn't defamation, but just truth. It was a legal threat lead by Dan, where he personally sought to make a 4-6 figure reward off of me. Why this is even mentioned is bizarre.

Claim 11 — You called him "Scamming Dan" and portrayed him and his firm as scammers. (¶¶ 29, 68(a))

Response

I am protected in calling him Scamming Dan under my first amendment rights.

This also is very clearly a rhetorical hyperbole where my intention was using a nickname to explain to the audience my opinion of his practice and his actions. Also calling something a scam isn't me accusing the firm of being a criminal operation and there isn't any law against calling something a scam. Using this logic, a company like Amway could sue every person that calls them a scam. There's also Mike Lindell of MyPillow, who often is called a scammer, because he says his pillows are buy one get one free, which is always a permanent offer he makes and many call it a scam sales tactic, due to it just being two pillows. That is commonly called a scam and why he got an F from the Better Business Bureau, but using this logic, someone like Lindell can sue them.

To help the public understand potentially unethical or dishonest tactics that might not necessarily be illegal, the word scam is commonly used. This is a method that is protected under the first amendment, not a direct accusation that someone like Dan is breaking the law and something I would happily call Dan again, feeling it does match him and his firm even more now with new information obtained.

Claim 12 — You said the firm cared more about making money than helping photographers. (¶ 30)

Response

Once again, first amendment rights apply here and this is 100% just a statement of opinion clearly that a business is interested in their bank account. If we begin to sue every person that accuses a business of being greedy, Senator Bernie Sanders would be about 10 trillion in debt now. I'd also like further context from Dan Desouza on how this very clearly wasn't opinion and defamation.

On top of that, in my first call with Dan Desouza, he bragged to me that he won a case for $207,000 and kept flexing that as his big victory. That case he only won $10,000 for his client and the rest of the $197,000 went to him and his firm in loser pays. I would use that as pretty strong evidence he's happily looking to make a profit when his biggest win he can name when questioned is a case he made 90%+ of the money and his firm also charges clients 45% for settlements.

If he wishes to prove me wrong on this, he is welcomed to turn this into a 501c3, cap his salary to non profit levels and do this for his clients. Until that point, my first amendment rights on my opinion seem like a safe defense here.

Claim 13 — You said they didn't know copyright law and that Dan wasn't a lawyer or didn't actually practice law. (¶¶ 31, 68(b))

Response

Obviously in the video I said Dan is a lawyer. The entire video was about him and discussing his work as a lawyer. The comment about him not being a lawyer or practicing the law was meant as an insult in the sense the way he practices the law itself makes him not true in the sense the law is a moral thing designed to help people. It's like saying someone isn't a true artist, doctor, singer or another profession doubting

the quality and methods of their work. In the video numerous times I said he was a lawyer and never questioned his license. I just said I felt he wasn't a true lawyer in the sense his work wasn't ethical for my opinions and at the same time, he practiced a bended version of the law which I felt was designed to enrich people like him.

This again falls under first amendment rights, where I never claimed he wasn't a licensed lawyer and numerous times said he was. Just for comparison, this would be like a singer who makes a questionable new music genre suing an older person that says it's not real music.

Claim 14 — You accused Dan of breaking legal ethics rules. (¶ 68(c))

Response

In this complaint, Dan failed to name one actual quote from me saying I claimed him or his practice broke the law or legal ethic rules. I did in the video question his morals as a person, which new evidence in the audio tapes backed up, where I proved talking to his firm they don't weigh or calculate demands, but instead just try to count the wealth or insurance status of potential people to sue.

Again, this is difficult to respond to without him providing more detail and for this, I still reserve first amendment rights.

Claim 15 — You said Dan bragged to you about winning roughly $203,000 in the Dugar case. (¶ 32)

Response

I said he bragged about it, because he did. When I told him over the phone he never has won anything close to the $280,000 he wanted me to settle for, he said that two years prior he won a case for $207,000. Again, nearly $100,000 less than the $280,000 he wanted, so a bit of a stretch there, but if he can provide the record of the call, he did indeed bring that case up, which is how I found out about it. He also later that day sent me the whole file on the case in clearly an attempt to gloat and make me feel threatened of his abilities at winning $10,000 for a client and charging $197,000 in legal fees to the opposing side that the client wouldn't have been charged if he lost.

On this, there is no defamation, me telling it is 100% in first amendment rights and for the record, Dan really did brag about this, because it was all he had going for him when it came to wins to name to make me feel threatened. For this, Dan is welcomed to show email or phone proof he didn't do that, but he will be unable to, due to him doing that.

Claim 16 — Dan says he explained the Dugar outcome to you by phone and you misrepresented it anyway. (¶ 38)

Response

Complete lie on Dan's part to the court. He never in any detail provided detail on the Dugar case once. He only said he won $207,000 and never offered any explanation. I called it as a lie and he emailed me the

case later, providing zero additional context. Dan also records calls from his office. For this, I demand that he shows that part of the conversation to the court, because it will show he is clearly lying in this claim.

Also, for what it's worth, I didn't misrespresent anything about that case. I pointed out how he only won $10,000 for his client, got $197,000 in loser pays, wasn't going to charge his client legal fees if he lost and that clearly was his business model. That is quite literally all I said about it and how I found the idea someone can get almost 20x in legal fees what the actual verdict was a huge issue in the copyright court.

This applies to the first amendment, where every American can disagree with policies and court cases currently going on. Unless we lost that right, in which case I would ask Dan to go the OJ Simpson estate and offer to represent the family against anyone who disagree with that cases verdict.

Claim 17 — You called his conduct after the $10,000 verdict immoral and said he scammed Dr. Dugar. (¶¶ 39–40)

Response

I did. I don't believe $197,000 on a $10,000 case makes any sense. I never said it was illegal in what he did, but said this was an ongoing issue in the copyright court, where firms like Dan's are known for using the loser pays clause in the court to make people being sued afraid of extreme penalties by the opposing counsel's lawyers if they lose, even if the case could be as small as $150 and that is causing settlements for cases that otherwise might be winnable in fear.

Once again, this is clearly an opinion that meets the first amendment. I feel the tactic is a scam, where while not illegal, the model is absurd claims for relatively short cases and also cases no client would ever actually find worth risking those levels of legal fees for if Dan doesn't offer to not charge if they lose. This isn't an accusation of breaking the law, but it's a conduct I don't approve of, feel others need to know needs to be reformed and I used the first amendment to show it, where I am protected.

Claim 18 — You said Dan and the firm stole roughly $193,000 in legal fees from Dr. Dugar. (¶ 68(d))

Response

I never said he actually stole the money from Dr Dugar, because I explained the entire process within the court he legally gets the money. What I did however say the word steal in the sense the way the industry works is a theft in itself. This would be similar to the word theft or stealing being used legally in many settings, where people all the time saying things like taxation is theft, speeding tickets are stealing and under the first amendment, they can as a criticism to government policy.

I never once accused Dan or his firm of breaking the law, but I used the first amendment to say very very clearly I disagreed with how the loser pays court works and found it a theft in the case a lawyer could charge almost 20x what a cases actual win was on a three day case.

Claim 19 — You said they inflated the Dugar bill and didn't work anywhere near the hours claimed.

They say the fee award covered 370.3 hours over more than two years, including a three-day trial. (¶¶ 35–37, 43, 68(e))

Response

Never officially said they inflated the bill. I said I wouldn't put it passed them and had reason to suspect issues. When I spoke to Dan's team initially, his paralegal Larissa said they were involved in over 4,000 lawsuits and settlements per year. If Dan followed that model, 370 hours would come to over 9 weeks of labor or close to 20% of a year's work, while his firm also mentioned they did tons of other cases. This is why I had serious questions and wanted people to know what was going on. On top of that, there was a question of what he charges hourly, where Dan's firm in admission to me and open marketing works for 45% settlement fees and also doesn't directly charge clients in most cases, yet instead opting to monetize off the loser pays model. This creates a strong concern on how hours are averaged in price in the first place.

That ring said, I never formally said he was breaking the law or inflating numbers, but said I had serious questions in how $193,000 could be found on a 3 day case where the actual amount won was so small, mentioning this as a serious risk of the loser pays court.

Again, this is my first amendment right showing issues with the legal system.

Claim 20 — You said firms use bots to find people using photos and try to bring thousands of cases. (¶ 40)

Response

This is 100% true and was even admitted to me in the call I had with Dan's law firm and his sales rep. They acknowledge the use of software to find photos being "misused" online as the main tactic for finding potential people to sue. They also said they encourage clients to use software to find potential lawsuits also.

Claim 21 — You suggested Dan and his firm work with clients to plant photos online as bait and sue people who use them. (¶¶ 40–41, 68(g))

Response

False. I said there is a history of firms like Dan's of planting photos in a practice often called honeypots. I didn't say they actually did that, but said clients of there's do and they are likely aware.

When I called Dan's firm claiming to be a potential client, I asked about honeypots and they said many of their clients are accused of doing so and they didn't care. I also said I intended on using honeypots and got a laugh from his sales rep, showing no warning not to do so.

This was me using the first amendment to point out a potential risk to firms like Dan, which sadly I feel new evidence points very likely that they are actually involved in this, which again I never formally accused them of that, but said with their industry it is likely.

To defend this, Dan is welcomed to provide client information, where I think he could provide peace to both the court in myself on divulging where his clients place photos in the first place online that people take and explaining in detail on how these aren't honey pots.

Claim 22 — You said Dan offers to represent clients for free and exaggerates the fees if he wins. (¶ 42)

Reponse

This is sadly 100% true. I called his firm and asked about pricing. They don't charge clients anything, which is also supported by language on their website, but rely on 45% commissions. They also don't in the majority of cases charge the clients anything either if it goes to court and again rely on loser pays.

Also again, I didn't formally say they exaggerate bills, but said how things are done has little oversight to prove if they do or do not, which puts the industry in question. It's why I had intense questions on $197,000 in legal fees for a 3 day case, which is far higher than the industry average for lawyers, which would normally be $8,700 in the US on a 3 day case.

Having called Dan's firm and them admitting they don't calculate claims and admit to trying to charge more if they find out a client is wealthy or has insurance, this again gives me more fear the worse potential side in how his estimates are made could be true.

Again, Dan is welcomed to offer more detail in this case, but I am using the first amendment, I never directly said fraud and said there is a lot of evidence exaggeration could be happening.

Claim 23 — You called Dan a disgusting person over the alleged fee markup. (¶ 43)

Response

I would like it added to the record I do in my first amendment rights believe Daniel Desouza is a disgusting person. In fact, I'd for the record like it said he is the worst lawyer I ever encountered and so disgusting I wouldn't shake his hand, feeling he doesn't wash it.

And again, me saying I find a person disgusting is one of the many claims here that has absolutely nothing to do with defamation at all.

**The poll, emails, and followers**

Claim 24 — You asked viewers in a YouTube poll whether Dan was a scammer. (¶ 51)

Response

I brought up the $197,000 made for a 3 day case in loser pays and asked people if they felt it was ethical. I've also asked if OJ was innocent, Casey Anthony a murderer and I ask people's opinions on legal cases almost once a week.

If there is a law that says we can't put polls out asking the public legal questions, it clearly got passed as some sort of earmark in a random post office rename legislation in congress and only got reported by CSPAN and no other coverage, because I wasn't made aware. If Dan Desouza can now say the law where we banned polling people's views on legal cases and suddenly wiped out the first amendment, I'd like him to share it with myself and the court.

Claim 25 — You said in a pinned comment that his firm sues more than 4,000 people a year over images. (¶¶ 51, 68(f))

Response

This number was provided to me by Larissa who is a paralegal working for him in our initial call and Dan has a record of he can provide. She said they handle 4,000 cases per year via direct lawsuits or settlement messages, which is just me parroting what his own employee said. Dan is welcomed to show the call with Larissa and say she didn't say it, but she clearly did.

Claim 26 — You said the firm only charges clients if it wins, uses fee shifting to its advantage, and likely runs photo honeypots. (¶ 51)

Response

Again, he does charge clients if he wins, that was established in the call I had with the firm and it's in the transcript and his firms own marketing online says that. Also for fee shifting to his advantage, the $197,000 Dan bragged to me he won in loser pays suggest that clearly. Finally, saying he likely is involved in honeypots was supported with the call, but at the same time wasn't directly accusing him of breaking the law.

All of which is protected for me saying in the first amendment. It should also be noted at this point Dan is claiming 2+ million in damages against me, before his legal fees which I'm sure he'll say are over $100,000. He is now citing a comment on a YouTube poll as the second case for why that video is justified, after the TikTok video wasn't convincing enough for the court.

Claim 27 — You posted Dan's email address and encouraged followers to go after him. (¶ 52)

Response

Completely legal to do. This is a corporate email made public online and in marketing. People can encourage the public to send opinion messages to private companies and organizations all they want.

This again is the freedom of speech and I didn't encourage any harassment, but instead giving Dan opinions on how he operates in away that hurts content creators and damages the type of consumption they get for content they enjoy.

Claim 28 — You repeated the Dugar billing accusation in the poll comments. They say your posts led

readers to believe the firm charged its own client $193,000, baited Dr. Dugar, or inflated its fees. (¶¶ 53–54)

Response

He did charge his client $193,000 that went to Dr Dugar in loser pays. That fee clearly was never going to be actually paid by the client as a condition of the lawsuit, but on record for a $10,000 case, Dan did charge from him and his firm $193,000 which got pushed over.

It's exactly what happened and me exposing that is first amendment rights.

Claim 29 — Viewers called them scammers, called for disbarment, or threatened violence. Other viewers warned you that you might be sued. (¶¶ 55–56)

Response

Using the logic I should be in anyway responsible for violence against Dan is saying Ronald Reagan should have sued Jodie Foster for encouraging the nut that tried assassinating him.

I told a story of a firm that I feel more recently I confirmed has serious issues in targeting clients in masses, not weighing claims and enriching themselves off settlement claims that they don't even pursue often. People can take that information and call them scammers or want them disbarred with the correct information I provided. I never encouraged threats of violence and never will. Also, if Dan Desouza does directly ask me, I will publish a video discouraging violence against him or his practice, saying criticism should be reserved in a professional sense and never a physical one.

Also, if he'd like he is welcomed to sue the people commenting. He'd have about as much validity to sue them for defamation over YouTube and TikTok comments as he's suing me right now.

First amendment applies here and again, he is now making an unrelated claim on defamation, associating the reactions of people who got true information and blaming in negativity off of it on me.

Claim 30 — You sent more emails invoking your following, threatening to get Dan disbarred, and accusing them of lying about the hours billed in Dugar. (¶ 57)

Response

First up, this has nothing to do with defamation and should be removed from the case entirely. Anything I said in emails wasn't defamation, but just me angry at him and saying actions I planned to take.

Second, I do 100% wish to get him disbarred. His firm admitted to me in a call that they don't weigh claims when trying to get settlements with people, going by the wealth of clients over actual damages. His firm admitted to not pursuing numbers close to the initial claims they make, even marketing to potential clients that they'll drop settlement offers by 70% after the first call. Even this case right here is an offense, where he is lying to the court. He is claiming 1.5 million in damages with no actual evidence of

those damages or lost income. He is claiming $750,000 in mental damages without attending therapy once or showing once shred of evidence mental distress cost him anything.

I do believe this man should be disbarred and will proudly say I plan to work to get him reported to the bar, have bad things his firm is doing known to the public and want to create a better system where bad actors like this don't sue creators, entrepreneurs and hard working people while wasting the courts time.

Claim 31 — They characterize some of your emails as extortionate and say you sent them to deter a copyright suit. (¶ 58)

Response

False. I sent emails cursing him out, because I found it amusing to curse him out and call him an idiot. It had nothing to do with dropping the copyright suit, where I knew it wouldn't ever go anywhere, his team admitted most cases like mine never go anywhere and I'd have won that case easily anyway for fair use.

Also again, this has nothing to do with defamation at all.

Claim 32 — You privately repeated the scam, inflated billing, three-day case, and photo-bait accusations to followers. (¶ 59)

Response

Previous statements above should clarify this and it's not needed to restate.

Claim 33 — You publicly and privately encouraged followers to contact and harass them. They cite emails, website messages, and anonymous messages they say came from followers. (¶¶ 60–62)

Response

Completely false. I asked people online to spread the content onto Reddit, yelp and other places online people can learn more about them if potentially sued. On top of that, I never messaged any followers to do so. Dan wasn't important enough for that aspect of my time and that is a lie to the court.

Claim 34 — You made other false statements to third parties to divert attention from the copyright allegations and discourage their client from suing. (¶¶ 63–64)

Response

I called the firm and said numerous times they admitted that most settlement cases they send never go anywhere. At one point in the call, I said 95 out of 100 settlements go nowhere and it was relying on the 5 that do, which Dan's salesperson did agree with while being careful to not undermine the firm. They also said half the cases never go anywhere.

The simplest way to solve this is simple. If Dan can provide a list of every settlement letter they've sent in the last 3 years and what percent of those they got settlements from, how many they followed up on, how many got abandoned and how many lead to a lawsuit, that can clarify if this was actually just a strategy to stop a case or had any impact. My case is it wouldn't have continued regardless of the video, because of the large percentage of cases he has that never go up.

Also for his initial point, I've said this before and will again. I never did any of this to divert from the case, it was promoting information.

**What they say you knew and what they say it cost them**

Claim 35 — They allege the video reached about 175,000 viewers, including at least 1,000 people in Florida, among them staff and Florida attorneys. (¶¶ 44, 49–50)

Response

The video has over 200,000 views now, but there's no actual proof it reached 1,000 people. For transparency on data, 60% of viewers for that video were US based, but TikTok doesn't offer any information on state by state data, so he has no actual evidence saying that.

That being said, I don't think it is unrealistic that 1,000 people in Florida saw it and many of them were attorneys, but the video had nothing wrong in it, was protected under the first amendment and I'm upset 10 million people in Florida didn't see it.

Claim 36 — They say your statements were false and you knew they were false when you made them. (¶¶ 69–70)

Response

This claim is redundant of everything before and I've addressed this many times.

Claim 37 — A Florida lawyer who was considering hiring Dan allegedly hired someone else after watching the video. They say the case likely would have involved at least $100,000 in legal fees. (¶¶ 45–47, 71)

Response

For this claim, I'd request Dan provide more information. Was this $100,000+ in legal fees directly going to Dan as payment or potential earnings off settlements and potential loser pay wins? I'm asking this, due to no record I can find of Dan taking large fees upfront or having clients directly paying him in this world. Also based on his firm admitting they don't calculate settlements to damages, him wanting $750,000 for mental distress that doesn't exist and various other issues, I question how he reaches numbers.

On top of that, I'd also like to know if Dan can provide data into how many prospective clients he talks to that don't actually end up developing into business? If Dan talks to say 50 potential clients per year and

40 don't turn into paid deals, why now is this case a stand out and my video was anything more than an excuse that potential client gave to leave with many others?

Finally, this is completely fine and protected with me in the first amendment. If a person talks about a person or firm in a true manner, which I did and people don't wish to work with them going forward, that isn't grounds for defamation, even if the complaints are heavily opinion based. Dan trying to sue for this would be like a lawyer suing someone for leaving a bad yelp review.

On top of that, from looking at Dan's firm, they've had no major layoffs, he didn't name one standing client they actually lost and he only cited one potential claim of him losing a client, which could potentially be one of countless he's lost without providing more information on his success rate of recruiting clients.

Claim 38 — An existing client allegedly worried that staying with the firm would hurt her reputation. They say clients stopped sending new cases, costing the firm hundreds of thousands in expected profits and damaging its reputation. (¶¶ 48, 71)

Response

This shows how this case isn't very strong. He can't even name a clear financial loss, so he cited a potential one. My argument here stands the same as the previous case.

Claim 39 — They say you acted maliciously or disregarded their rights and seek punitive damages. (¶ 72)

Response

I did not and this has been explained in detail case by case, so leaving that here.

I do intend on filling against Dan for damages involving my time, but unlike him will seek fair numbers in the range of $2-7,000, due to my desire to not game the legal system for my own wealth unlike him and work for a living.

The original complaint also contains **two separate claims**:

Claim 40 — They say you profited from misleading videos and polls, which they claim violated Florida's unfair trade practices law. (¶¶ 73–77)

Response

One of the biggest joke claims here.

First up, the polls on YouTube provide no revenue at all and the amount of votes on that poll got 70% less than my voter average. I made $0 on that and have never monetized my polls at all. It's just a passion for me to communicate with people.

Second, the video cost me money. I made $170 off of it via what TikTok pays. Off TikTok, that account makes around $4-8,000 per month depending on video success. I also get bonuses via TikTok for film/tv content, which that video was disqualified from. That video due to added research also took more time to make and got less views than my normal content, so it wasn't any notable profit.

That being said, I wanted to use this to educate. So I am willing to offer proof to the court and Dan I only made $170 to the video and if he accepts, will donate $170 to a children's charity in his area as proof I never did this with the intention of monetizing. He is welcomed to request in future documents a charity or email me directly.

That being said, this was never about money, but education and I'll happily forfeit any money to a good cause made off it. I'd also like an apology from Dan directly for the claim this was to make money.

Claim 41 — Dan says you used his name and photos of him and his staff commercially without consent, including in the video and poll. He also cites your stated plan to sell a "Scamming Dan" shirt. (¶¶ 78–83)

Response

I used photos he posted on a public instagram to market his business. Every piece of content he posted I used for education on my audience and telling the story, which they made public and never attempted to have their social media be private in any form. Dan also uses his social media to market himself as an industry leader in the space doing multiple videos on copyright content, to be an influencer in the industry. It has almost no views, but despite that is clearly him making it public and this does give me the right to use that content and others posted on this account for commentary on the business.

The Scamming Dan shirt has not been made or sold yet, but I can promise it won't feature any photos of Dan. Also, I'd gladly offer him 45% of profit off the shirts similar to the deals he offers his clients. Perhaps he can use the money to fund a legal tutor to explain the law better to him.

EXHIBIT A — OCTOBER 27, 2026 TELEPHONE CALL — DRAFT TRANSCRIPT

The following transcript is reproduced from the existing machine-generated draft. Its wording, speaker identities and timestamps have not been independently verified against the original recording. The caller used the name "Chris" and described himself as a prospective client. The transcript is offered as a proposed exhibit, not a judicial finding or authenticated proof.

OCTOBER 27, 2026 QUO CALL — DRAFT TRANSCRIPT

Source: 10_27_2026,_2_21_23_PM(2).mp3

Audio duration: 28:45.2. Timestamps are approximate elapsed time in the supplied file.

Machine-generated draft. The wording has not been independently checked against the audio.

Speaker roles are estimates based on voice and context. Individual identities are unverified.

An uncertain or mixed speaker label means the voices could not be reliably separated for that line.

[Check audio] flags a lower-confidence passage. Unmarked text may also contain errors.

[00:00.2–00:05.2] Automated greeting: Thank you for calling Copycat Legal.

[00:05.2–00:09.3] Automated greeting: Please listen carefully as our menu options have changed to speak with our office.

[00:09.3–00:11.5] Automated greeting: Press 1.

[00:11.5–00:14.7] Automated greeting: If you are a potential client, press 2.

[00:14.7–00:26.8] Speaker unclear: Sorry about that. [Check audio]

[00:26.8–00:28.1] Caller: Hey there. [Check audio]

[00:28.1–00:29.0] Caller: My name is Chris.

[00:29.0–00:36.6] Mixed or uncertain speakers: I'm calling from Fresco Media about potentially using you guys as a media partner, what legal partner am

[00:36.6–00:36.9] Caller: I about?

[00:36.9–00:39.0] Speaker unclear: Okay.

[00:39.0–00:40.2] Speaker unclear: Sorry about that.

[00:40.2–00:41.9] CopyCat Legal side: No worries.

[00:41.9–00:43.8] CopyCat Legal side: Let me just open up notes here real quick here.

[00:43.8–00:45.6] Speaker unclear: All right.

[00:45.6–00:47.0] CopyCat Legal side: Hold on just a moment.

[00:47.0–00:50.8] Speaker unclear: All right.

[00:50.8–00:51.8] Speaker unclear: Can I catch your name again?

[00:51.8–00:52.7] Speaker unclear: Chris. [Check audio]

[00:52.7–00:53.9] Speaker unclear: Chris?

[00:53.9–00:56.6] Speaker unclear: Yes.

[00:56.6–00:57.6] CopyCat Legal side: All right.

[00:57.6–00:59.5] Speaker unclear: And your company, can you repeat that for me please?

[00:59.5–01:01.9] Speaker unclear: Fresco Media.

[01:01.9–01:04.0] Mixed or uncertain speakers: Fresco, F-R-E-C-O.

[01:04.0–01:05.9] Mixed or uncertain speakers: F-R-E-S-C-O, yes, media.

[01:05.9–01:13.0] CopyCat Legal side: Could you tell me just a little bit about your company and how you think we can help?

[01:13.0–01:14.0] Caller: Okay, sure.

[01:14.0–01:16.0] Caller: So we have recently raised venture funding.

[01:16.0–01:18.0] Caller: So we're a software company.

[01:18.0–01:22.5] Caller: We're independent journalists, or just, you know, regular people who want to, you know, make a little

[01:22.5–01:23.0] Caller: extra money.

[01:23.0–01:26.2] Caller: They can record photos and also videos.

[01:26.2–01:30.2] Caller: And then, you know, basically sell them to us, and then we sell them to other groups.

[01:30.2–01:33.1] Caller: And then we also place them online in some strategic ways.

[01:33.1–01:35.0] Caller: You know, do that as well as part of our business.

[01:35.0–01:40.0] Caller: And recently we've raised about $3.5 million over the last six months.

[01:40.0–01:45.7] Caller: And then also at the same time for our business, we purchased about 80,000 photos from independent

[01:45.7–01:46.1] Caller: groups,

[01:46.1–01:50.0] Caller: a lot of people who cover, you know, celebrity stuff, photos.

[01:50.0–01:56.6] Caller: And we've just been buying, you know, like reserve images of other photographers' accounts.

[01:56.6–02:05.6] CopyCat Legal side: Okay, so would it be accurate to say that it is similar to an image licensing agency?

[02:05.6–02:06.6] CopyCat Legal side: Yes.

[02:06.6–02:10.6] Speaker unclear: Okay, James.

[02:10.6–02:17.5] CopyCat Legal side: Have you found any infringements of your clients' copyrighted work, things like that?

[02:17.5–02:18.5] Mixed or uncertain speakers: Well --

[02:18.5–02:21.6] Speaker unclear: What is it that kind of brings you to the legal side?

[02:21.6–02:26.3] Caller: Well, we're actually just looking to kind of be protected in what we've been doing, you know, more and

[02:26.3–02:26.7] Caller: more often.

[02:26.7–02:30.6] Caller: And I just have a few questions for you, because, you know, basically what I did was,

[02:30.6–02:35.6] Caller: I just used chat GPT to make a list of legal firms in the copyright space.

[02:35.6–02:37.6] Caller: And you came up on our top ten.

[02:37.6–02:40.6] Caller: So we're just -- you know, kind of just feeding through and asking some questions.

[02:40.6–02:42.5] Speaker unclear: Got it.

[02:42.5–02:43.5] CopyCat Legal side: No worries.

[02:43.5–02:44.4] CopyCat Legal side: Yeah, ask away.

[02:44.4–02:47.4] CopyCat Legal side: I'm happy to just answer any questions about general processes, things like that.

[02:47.4–02:48.4] Mixed or uncertain speakers: Okay.

[02:48.4–02:51.6] Caller: Well, first one is just regarding the payments.

[02:51.6–02:54.6] Caller: So how exactly do you guys work as a payment model?

[02:54.6–02:58.6] Caller: Because, you know, we're trying to get a relationship with somebody who, you know,

[02:58.6–03:01.5] Caller: if we find infringements, they can send notifications.

[03:01.5–03:03.6] Caller: But, you know, are you guys upfront?

[03:03.6–03:07.6] Caller: Do you guys try and take, you know, something on the back end, the legal fees?

[03:07.6–03:09.6] CopyCat Legal side: How do you guys normally work with that?

[03:09.6–03:17.1] CopyCat Legal side: Yeah, so typically when our clients send over a typical copyright enforcement case,

[03:17.1–03:21.9] CopyCat Legal side: our firm works on contingency for those typical cases.

[03:21.9–03:29.3] CopyCat Legal side: So essentially we would send a demand letter out, notifications, as you were saying, to the infringing

[03:29.3–03:29.8] CopyCat Legal side: entity.

[03:29.8–03:33.8] CopyCat Legal side: And then we have our legal team that try and negotiate a settlement there.

[03:33.8–03:35.3] Speaker unclear: Okay.

[03:35.3–03:37.5] CopyCat Legal side: So that is -- yeah, so that's all upfront.

[03:37.5–03:39.5] CopyCat Legal side: That's no cost to the client.

[03:39.5–03:42.5] CopyCat Legal side: It's when we hopefully arrive at a settlement.

[03:42.5–03:49.5] Mixed or uncertain speakers: Our firm typically has a contingency of 40 percent of that settlement is what we would take from that.

[03:49.5–03:54.5] CopyCat Legal side: So the client received the majority 60 percent of that settlement pre-litigation.

[03:54.5–04:02.2] CopyCat Legal side: And that's how that case then be reviewed and approved by you, the client, to get escalated to a litigated

[04:02.2–04:02.5] CopyCat Legal side: case

[04:02.5–04:03.4] CopyCat Legal side: or to file a lawsuit.

[04:03.4–04:09.5] CopyCat Legal side: Our firm typically -- our contingency would be 45 percent of that litigated settlement.

[04:09.5–04:12.5] CopyCat Legal side: So the client would receive the majority 55 percent of that settlement.

[04:12.5–04:14.5] CopyCat Legal side: Okay, so it's 55 percent.

[04:14.5–04:21.3] Speaker unclear: And you guys are not really in the business of, you know, like, so basically there's no upfront fee to

[04:21.3–04:21.7] Caller: you guys

[04:21.7–04:25.2] Speaker unclear: if you guys approve working with us.

[04:25.2–04:32.0] Speaker unclear: But if it's a -- if it's a typical copyright enforcement case, it's contingency for the majority of

[04:32.0–04:32.7] CopyCat Legal side: those

[04:32.7–04:37.6] CopyCat Legal side: unless there's, like, a super specific instance that we have to speak with the managing partner about.

[04:37.6–04:39.6] CopyCat Legal side: But that's how we typically operate contingency.

[04:39.6–04:47.9] CopyCat Legal side: So the only ones that are more, like, upfront costs would be if you want to start copyright registering

[04:47.9–04:48.7] CopyCat Legal side: the work.

[04:48.7–04:50.7] CopyCat Legal side: So, for instance, if you want to --

[04:50.7–04:51.7] Mixed or uncertain speakers: Trademark.

[04:51.7–04:54.6] CopyCat Legal side: Copyright registration certificate, trademark, things like that.

[04:54.6–04:57.6] CopyCat Legal side: Sometimes those are flat fees or hourly depending on that.

[04:57.6–05:00.6] CopyCat Legal side: But the enforcement aspect, those are contingency.

[05:00.6–05:03.6] Caller: Okay, so there are actually some images we want to trademark.

[05:03.6–05:08.5] Caller: Not that many, probably about -- you know, I'm going to be honest, probably about 0.1 percent of the

[05:08.5–05:09.7] Caller: images in our vault, if that.

[05:09.7–05:11.7] Caller: But what do you guys normally charge for trademarking?

[05:11.7–05:18.3] CopyCat Legal side: So for an image, we would typically copyright that rather than trademark.

[05:18.3–05:21.3] CopyCat Legal side: It depends, again, on your specific instance of the case.

[05:21.3–05:27.4] CopyCat Legal side: But for the copyright of it, we charge a flat fee per application.

[05:27.4–05:32.4] CopyCat Legal side: So you can copyright up to 750 images per application.

[05:32.4–05:37.3] CopyCat Legal side: So for that one application from one to 750 photos, it's all the same price.

[05:37.3–05:42.3] CopyCat Legal side: We charge a flat fee of $100 and then plus the $55 application fee.

[05:42.3–05:46.4] CopyCat Legal side: So it's a flat fee of $155 per application.

[05:46.4–05:50.4] Caller: Okay, so my next question is going back to the regular images, not the, like, the copyright images.

[05:50.4–05:56.4] Caller: But for regular images, what do you normally try to -- what do you think is a fair number when people

[05:56.4–05:57.4] Caller: are infringing,

[05:57.4–05:59.4] Caller: let's say it's a website or some sort of social media post?

[05:59.4–06:01.3] Caller: How do you guys normally calculate that?

[06:01.3–06:08.0] CopyCat Legal side: Yeah, so our demand calculation, we kind of have multiple considerations for that.

[06:08.0–06:15.8] CopyCat Legal side: A registered image, so for instance, let's say the image was copyright registered and then the

[06:15.8–06:17.1] CopyCat Legal side: infringement happened.

[06:17.1–06:21.6] CopyCat Legal side: Legally, we are more open to get statutory damages for that.

[06:21.6–06:27.5] Mixed or uncertain speakers: So that one, our demand typically goes out at $30,000 as just like the initial demand,

[06:27.5–06:32.0] Speaker unclear: and then we start negotiations from there and we kind of find a middle ground with the infringer on that

[06:32.0–06:32.5] CopyCat Legal side: front.

[06:32.5–06:38.9] CopyCat Legal side: An image, let's say, wasn't registered at the time of the infringement or maybe it was never registered.

[06:38.9–06:46.1] Mixed or uncertain speakers: So that one, the demand that we send out is going to be on the lower end just because now we're going to

[06:46.1–06:47.9] Speaker unclear: actual damages, things like that.

[06:47.9–06:51.9] CopyCat Legal side: It's just a little harder to justify a higher starting point with that.

[06:51.9–06:56.9] CopyCat Legal side: Sometimes those get sent out at $10,000, I believe is the initial demand for those.

[06:56.9–07:02.1] CopyCat Legal side: And then we try to, again, settle kind of down in the middle ground there with the infringer.

[07:02.1–07:05.2] CopyCat Legal side: What do you guys normally settle at, like would you say?

[07:05.2–07:12.2] Mixed or uncertain speakers: Because if we start off at $30,000 and let's say someone uses eight images and now they're for over $200,000,

[07:12.2–07:16.9] Speaker unclear: what would you realistically try to get at the end of the day?

[07:16.9–07:19.9] CopyCat Legal side: Yeah, so multifoto cases, the demands go up.

[07:19.9–07:22.9] CopyCat Legal side: So it's $30,000 per registered image for that one.

[07:22.9–07:29.0] CopyCat Legal side: Again, that's if the image was copy registered, of course, before the infringement happened.

[07:29.0–07:30.9] CopyCat Legal side: That's when you kind of see those higher demands.

[07:30.9–07:36.2] CopyCat Legal side: Multifotos, those can be pretty high, those initial ones.

[07:36.2–07:40.1] CopyCat Legal side: Honestly, it really depends on the specifics of the case.

[07:40.1–07:45.1] CopyCat Legal side: If insurance shows up, there's always a higher likelihood of settling a lot higher than, let's say,

[07:45.1–07:52.3] CopyCat Legal side: just negotiating with the direct owner of the establishment who may not have as much funds available as

[07:52.3–07:53.1] CopyCat Legal side: insurance.

[07:53.1–07:58.5] CopyCat Legal side: Or if you see opposing counsel show up, now we have our attorneys kind of can negotiate there.

[07:58.5–08:02.6] Mixed or uncertain speakers: And there's two different law firms kind of negotiating.

[08:02.6–08:12.8] Mixed or uncertain speakers: So depending on the circumstances, on average, one photo case registered, we typically try --

[08:12.8–08:16.8] CopyCat Legal side: I feel the average is around $7,000, $8,000 for one photo.

[08:16.8–08:18.8] CopyCat Legal side: Again, it's all up to the specifics for the case.

[08:18.8–08:23.5] CopyCat Legal side: Some are much, much higher depending on who kind of shows up, how negotiations go, the licensing of the

[08:23.5–08:24.8] CopyCat Legal side: image,

[08:24.8–08:29.7] Mixed or uncertain speakers: if the image is licensed in perpetuity for only $100,000 or different things.

[08:29.7–08:41.0] Speaker unclear: So in negotiations, so let's say we send a demand letter out to an infringer and the owner contacts us.

[08:41.0–08:46.4] Mixed or uncertain speakers: And let's say we speak to them, they say they don't have insurance and they're not going to retain

[08:46.4–08:47.0] CopyCat Legal side: counsel.

[08:47.0–08:51.0] CopyCat Legal side: So in that instance, we would just be speaking with the owner of the company.

[08:51.0–08:54.0] CopyCat Legal side: So we are totally fine to negotiate directly with them.

[08:54.0–08:58.1] Speaker unclear: But sometimes they might not have as much funds available as, let's say, they turn the claim over to

[08:58.1–08:59.0] Speaker unclear: their insurance.

[08:59.0–09:03.0] CopyCat Legal side: So now insurance shows up and they may just have more funds available to them.

[09:03.0–09:06.3] CopyCat Legal side: So again, it's the specifics of every case.

[09:06.3–09:11.8] CopyCat Legal side: So we try our hardest for every single case to try to get our clients' best interest and get the

[09:11.8–09:13.1] CopyCat Legal side: compensation there.

[09:13.1–09:18.2] Caller: So if it's more of like a mom and pop kind of business here, we might try to get $500.

[09:18.2–09:23.4] Caller: But if it's a big company, we might be looking for a $50,000 check.

[09:23.4–09:28.8] CopyCat Legal side: Yeah, I mean it always depends on the type of infringer as well.

[09:28.8–09:32.8] CopyCat Legal side: Yeah, sometimes you can kind of see the writing on the wall that this might be someone that, you know,

[09:32.8–09:34.8] CopyCat Legal side: may be telling the truth that they may not have as much available.

[09:35.4–09:37.4] CopyCat Legal side: And some cases you're like, well, that's a bigger company.

[09:37.4–09:40.5] CopyCat Legal side: It seems like there should be a higher settlement there.

[09:40.5–09:41.4] CopyCat Legal side: So for sure.

[09:41.4–09:43.5] Mixed or uncertain speakers: - Okay, I can see some stuff with that.

[09:43.5–09:45.4] Caller: Now, regarding things with the core,

[09:45.4–09:49.1] Caller: what do you guys normally bill the customers,

[09:49.1–09:52.4] Caller: because I've seen it on the ends where some of these firms,

[09:52.4–09:56.4] Caller: they do these very aggressive fees on the backend

[09:56.4–09:58.3] Caller: because it's loser pays with copyright.

[09:58.3–10:01.5] Caller: And they're trying to fight this a lot more in court

[10:01.5–10:06.3] Caller: because we could be fighting over five, $10,000,

[10:06.3–10:09.1] Caller: but they might be looking at some sort of $50,000 deal

[10:09.1–10:12.8] Caller: on the backend when it comes to legal fees

[10:12.8–10:14.2] Caller: and that's what they're really fighting for.

[10:14.2–10:20.9] Speaker unclear: So how much do you guys normally charge per hour clients?

[10:20.9–10:26.5] CopyCat Legal side: - So for a litigated case, typically,

[10:26.5–10:28.8] CopyCat Legal side: I mean, it's the typical contingency.

[10:28.8–10:33.3] CopyCat Legal side: So it would be our 45% of the settlement

[10:33.3–10:36.8] CopyCat Legal side: and then less any advance costs.

[10:36.8–10:39.8] CopyCat Legal side: So it's not so much the legal hourly fees,

[10:39.8–10:40.7] CopyCat Legal side: things like that.

[10:40.7–10:42.5] CopyCat Legal side: It would be like the filing fee,

[10:42.5–10:44.4] CopyCat Legal side: which I believe is a few hundred dollars.

[10:44.4–10:46.2] CopyCat Legal side: That's just to file the lawsuit.

[10:46.2–10:48.7] CopyCat Legal side: So that is a cost that we eat at the beginning

[10:48.7–10:49.9] CopyCat Legal side: and then once we settle,

[10:49.9–10:53.2] CopyCat Legal side: we just kind of take that out from the settlement

[10:53.2–10:55.6] CopyCat Legal side: and then, so it kind of comes out of the settlement,

[10:55.6–10:57.9] CopyCat Legal side: if that makes sense rather than out of your pocket.

[10:57.9–10:58.7] CopyCat Legal side: - Okay, I see.

[10:58.7–11:00.9] CopyCat Legal side: - So yeah, less the advance cost.

[11:00.9–11:04.6] CopyCat Legal side: So a filing fee, if we have to have a processor

[11:04.6–11:07.8] CopyCat Legal side: serve the summons, any mailing fees,

[11:07.8–11:10.5] CopyCat Legal side: things like that kind of get taken out of the settlement

[11:10.5–11:11.8] CopyCat Legal side: rather than out of your pocket.

[11:11.8–11:13.2] CopyCat Legal side: - Okay, now here's a question

[11:13.2–11:15.5] Mixed or uncertain speakers: 'cause I'm calling up a few different firms right now,

[11:15.5–11:17.2] Caller: just trying to figure it out.

[11:17.2–11:20.9] Caller: The last firm I spoke to wasn't willing to tell me

[11:20.9–11:23.0] Caller: what they see normally on the settlements

[11:23.0–11:24.3] Caller: and they also weren't willing to tell me

[11:24.3–11:27.6] Caller: what percent of the time they come out

[11:27.6–11:31.5] Caller: and do one of these settlement letters

[11:31.5–11:34.1] Caller: and what percent they actually even bother pursuing

[11:34.1–11:35.2] Caller: or they advise pursuing

[11:35.2–11:38.5] Caller: because I talked to one person who was a photographer

[11:38.5–11:40.5] Caller: that we bought the photos from

[11:40.5–11:42.2] Mixed or uncertain speakers: and they were saying that

[11:42.2–11:45.0] Speaker unclear: they've used guys like you guys in the past

[11:45.0–11:47.8] Caller: and one big mistake is that they see it's like,

[11:47.8–11:49.8] Caller: okay, there's a lot of people infringing

[11:49.8–11:52.2] Caller: and then they'll send out the settlement letters

[11:52.2–11:53.5] Caller: and then they kind of tell them,

[11:53.5–11:56.2] Caller: oh, this is not worth pursuing back in court

[11:56.2–11:58.4] Caller: for reasons X, Y and Z.

[11:58.4–11:59.8] Caller: Do you have any numbers on hand

[11:59.8–12:02.8] Caller: of like how many of these letters you guys send out

[12:02.8–12:04.1] Caller: that really don't go anywhere

[12:04.1–12:06.0] Caller: because just not worth pursuing

[12:06.0–12:07.9] Caller: and do you have a number on what percent

[12:07.9–12:10.2] Speaker unclear: actually get a settlement, what percent go to court?

[12:10.2–12:13.3] Speaker unclear: How does that work out?

[12:13.3–12:16.4] CopyCat Legal side: - So I don't have the numbers offhand again,

[12:16.4–12:18.4] CopyCat Legal side: which would change like per quarter

[12:18.4–12:20.0] CopyCat Legal side: and you things like that.

[12:20.0–12:22.4] CopyCat Legal side: If you would like, I can speak with our managing partner

[12:22.4–12:23.9] CopyCat Legal side: and kind of see if he has any reports on that

[12:23.9–12:25.9] CopyCat Legal side: and get that over to you.

[12:25.9–12:27.5] CopyCat Legal side: Again, they would be averages.

[12:27.5–12:32.3] CopyCat Legal side: I can say however, that typically you're always going

[12:32.3–12:36.8] CopyCat Legal side: to have more letters sent out than settle,

[12:36.8–12:38.9] CopyCat Legal side: just like it's mostly a numbers game.

[12:38.9–12:44.0] CopyCat Legal side: Also you want to be mindful of the infringers

[12:44.0–12:45.4] CopyCat Legal side: that you're sending the letters out to.

[12:45.4–12:49.9] CopyCat Legal side: So we have some clients and they see real estate,

[12:49.9–12:52.6] CopyCat Legal side: celebrity photography, things like that.

[12:52.6–12:54.7] CopyCat Legal side: Sometimes they just kind of lend themselves

[12:54.7–12:57.8] CopyCat Legal side: to bigger companies that are more active.

[12:57.8–13:01.4] CopyCat Legal side: They have, they're more likely to have multiple locations,

[13:01.4–13:03.9] CopyCat Legal side: more likely to have people monitoring their websites

[13:03.9–13:06.3] CopyCat Legal side: and responding to emails, things like that.

[13:06.3–13:09.0] CopyCat Legal side: However, some people find that their images

[13:09.0–13:11.2] Mixed or uncertain speakers: are mostly used on just like online blogs

[13:11.2–13:12.4] CopyCat Legal side: or news or things like that

[13:12.4–13:16.3] CopyCat Legal side: where there's less so a physical location.

[13:16.3–13:18.2] CopyCat Legal side: Sometimes they're overseas.

[13:18.2–13:21.3] CopyCat Legal side: Sometimes there's not really an active communication there.

[13:21.3–13:23.4] CopyCat Legal side: There's no monitoring their social media.

[13:23.4–13:26.5] CopyCat Legal side: There's just, it's a bit hard to pin down.

[13:26.5–13:29.6] CopyCat Legal side: Those types of entities, sometimes we won't mind

[13:29.6–13:31.1] CopyCat Legal side: sending a letter out and just saying,

[13:31.1–13:33.0] CopyCat Legal side: hey, you know, what happens?

[13:33.0–13:33.9] CopyCat Legal side: Let's see.

[13:33.9–13:36.4] CopyCat Legal side: We'll just send a letter out and see who shows up.

[13:36.4–13:39.0] CopyCat Legal side: It's a lot easier at that stage to kind of do that

[13:39.0–13:42.2] CopyCat Legal side: and start negotiations there rather than filing a lawsuit

[13:42.2–13:44.5] CopyCat Legal side: at that stage with that type of entity.

[13:44.5–13:46.7] CopyCat Legal side: So with those types of cases,

[13:46.7–13:49.1] CopyCat Legal side: that's when that consideration would kind of show up.

[13:49.1–13:51.6] CopyCat Legal side: We're like, okay, well, we didn't mind sending one out

[13:51.6–13:52.4] CopyCat Legal side: and just seeing what happened.

[13:52.4–13:54.1] CopyCat Legal side: Unfortunately, they were unresponsive

[13:54.1–13:57.0] CopyCat Legal side: or unfortunately, they did not engage in negotiation

[13:57.0–14:00.1] CopyCat Legal side: but this is not one that we would recommend filing

[14:00.1–14:01.8] CopyCat Legal side: for instance, then we would close those.

[14:01.8–14:04.3] CopyCat Legal side: So we do see a fair amount of those

[14:04.3–14:05.8] CopyCat Legal side: and our clients are in the know about that.

[14:05.8–14:07.6] CopyCat Legal side: We have that conversation with them and kind of say,

[14:07.6–14:10.2] CopyCat Legal side: hey, this is kind of, in your best interest,

[14:10.2–14:11.4] CopyCat Legal side: we wouldn't recommend filing

[14:11.4–14:13.2] CopyCat Legal side: and then just defaulting on that for instance

[14:13.2–14:14.3] CopyCat Legal side: and then there's no one there

[14:14.3–14:16.4] CopyCat Legal side: that we can kind of collect on.

[14:16.4–14:17.4] CopyCat Legal side: So things like that.

[14:17.4–14:21.4] CopyCat Legal side: So it is something that we see, but yeah.

[14:21.4–14:24.2] Caller: - Okay, so this is just kind of part of the business.

[14:24.2–14:27.7] Mixed or uncertain speakers: If there's a situation where we send out 100 letters,

[14:27.7–14:30.0] CopyCat Legal side: it's not unrealistic to say 95 of them

[14:30.0–14:33.6] Mixed or uncertain speakers: might never go anywhere, but we're hoping for five.

[14:33.6–14:38.5] CopyCat Legal side: - I wouldn't say any percentages,

[14:38.5–14:41.9] CopyCat Legal side: any hard percentages at this point

[14:41.9–14:45.0] CopyCat Legal side: but I would say that it is something to be mindful of

[14:45.0–14:48.7] CopyCat Legal side: especially when the type of infringements

[14:48.7–14:51.3] CopyCat Legal side: are maybe smaller companies

[14:51.3–14:53.8] CopyCat Legal side: or maybe ones that are just purely run online,

[14:53.8–14:56.4] CopyCat Legal side: like there's no physical entity, something like that.

[14:56.4–14:59.5] CopyCat Legal side: But again, it's the type of cases that you get,

[14:59.5–15:00.8] CopyCat Legal side: the case-by-case basis.

[15:00.8–15:03.4] CopyCat Legal side: We've seen some companies that seem fairly small

[15:03.4–15:05.2] CopyCat Legal side: and they come back and their insurance shows up

[15:05.2–15:09.4] CopyCat Legal side: and we settle in the multiple figures there.

[15:09.4–15:11.0] CopyCat Legal side: So you don't ever really know,

[15:11.0–15:13.0] CopyCat Legal side: so we're kind of open to sending letters out

[15:13.0–15:15.8] CopyCat Legal side: and just again, we always try and follow up

[15:15.8–15:18.3] CopyCat Legal side: as much as we can and once it gets closed,

[15:18.3–15:20.2] CopyCat Legal side: it's pretty much that we've exhausted all attempts,

[15:20.2–15:22.8] CopyCat Legal side: so we really try and keep it open

[15:22.8–15:26.9] CopyCat Legal side: as long as we can and see what we can get there.

[15:26.9–15:28.9] Caller: - Okay, so my next question is also,

[15:28.9–15:30.8] Caller: and I apologize for taking up too much time,

[15:30.8–15:34.1] Mixed or uncertain speakers: I'm just trying to get everything noted down right now,

[15:34.1–15:36.4] Caller: but my next question is also about the image

[15:36.4–15:39.4] Caller: and how 'cause dealing with this in the past

[15:39.4–15:40.9] Caller: and also learning this industry

[15:40.9–15:43.0] Caller: because we're coming at this from the software side,

[15:43.0–15:45.7] Caller: so we're kind of learning copyright as it goes along,

[15:45.7–15:50.7] Caller: but one way we've realized is with image placement online,

[15:50.8–15:55.8] Caller: so there's a lot of people who are not always happy,

[15:55.8–15:58.1] Caller: 'cause once again, we're also working with photographers too

[15:58.1–16:01.8] Caller: and photographers have said we put our images online

[16:01.8–16:04.2] Caller: and honestly, it's a little bit strategic

[16:04.2–16:07.6] Caller: because at the end of the day,

[16:07.6–16:09.5] Caller: nobody has a right to the images they use online

[16:09.5–16:11.0] Caller: just 'cause they see them

[16:11.0–16:12.6] Caller: and some people get a bit angry

[16:12.6–16:15.3] Caller: where they feel they were sort of misled

[16:15.3–16:17.8] Caller: where they think these images are free.

[16:17.8–16:20.0] Caller: The term's kind of, they call 'em honeypots

[16:20.0–16:24.9] Caller: and we do place images on these places

[16:24.9–16:28.5] Caller: and do have software to track it out.

[16:28.5–16:33.4] Caller: Is that an issue for you guys if we're using any,

[16:33.4–16:36.8] Caller: we're putting them on third party sites that are licensed

[16:36.8–16:40.0] Caller: and if people by mistake happen and we can find that out

[16:40.0–16:44.6] Speaker unclear: later, is that an issue on your end?

[16:44.6–16:47.3] CopyCat Legal side: - I would say that most of our clients

[16:47.3–16:51.1] CopyCat Legal side: have their images online in some form or another

[16:51.1–16:54.3] CopyCat Legal side: and it's totally not uncommon for an infringer.

[16:54.3–16:57.6] CopyCat Legal side: I feel like that might be one of the most common arguments
[16:57.6–16:59.0] CopyCat Legal side: is oh, well, I found it on Google.
[16:59.0–16:59.8] CopyCat Legal side: It must be free.
[16:59.8–17:00.6] CopyCat Legal side: I found it online.
[17:00.6–17:04.3] CopyCat Legal side: It must be available for me
[17:04.3–17:06.0] CopyCat Legal side: so that's something that we run into a lot
[17:06.0–17:07.9] CopyCat Legal side: and that's not something that we are particularly deterred
[17:07.9–17:09.9] CopyCat Legal side: by 'cause we have the law on our side
[17:09.9–17:12.8] CopyCat Legal side: and we go, hey, these are copyright disclaimers on Google.
[17:12.8–17:13.8] CopyCat Legal side: They're everywhere.
[17:13.8–17:16.2] CopyCat Legal side: You should have done your due diligence on that
[17:16.2–17:21.0] CopyCat Legal side: so we're totally well versed in that argument.
[17:21.0–17:24.7] CopyCat Legal side: I will say if images are being placed on third party sites
[17:24.7–17:28.3] CopyCat Legal side: as long as we would ask that you as the client
[17:28.3–17:32.2] CopyCat Legal side: kind of keep an organized record of which companies
[17:32.2–17:34.6] CopyCat Legal side: you have licensed the images to,
[17:34.6–17:37.8] CopyCat Legal side: especially third party ones that can get a little,
[17:37.8–17:40.5] CopyCat Legal side: just falling through the cracks a little bit
[17:40.5–17:41.9] CopyCat Legal side: in case an infringer comes back and says,
[17:41.9–17:44.6] CopyCat Legal side: hey, actually I was licensed this image.
[17:44.6–17:46.6] CopyCat Legal side: I was given permission by a third party
[17:46.6–17:48.3] CopyCat Legal side: rather than your client.
[17:48.3–17:49.6] CopyCat Legal side: In that instance, we would just ask you,
[17:49.6–17:53.8] CopyCat Legal side: hey, do you have any relationship with this company?
[17:53.8–17:55.8] CopyCat Legal side: Do you think that they gave permission on accident
[17:55.8–17:58.1] CopyCat Legal side: or did you give permission, anything like that?
[17:58.1–18:00.9] CopyCat Legal side: So if anyone comes back with a license or permission
[18:00.9–18:02.8] CopyCat Legal side: or something like that, we would just ask that
[18:02.8–18:04.3] CopyCat Legal side: on your end you would be organized.
[18:04.3–18:05.6] CopyCat Legal side: Oh no, we did not authorize that
[18:05.6–18:08.4] CopyCat Legal side: or maybe our third party authorized that
[18:08.4–18:11.8] CopyCat Legal side: but we would still be okay pursuing them
[18:11.8–18:13.9] CopyCat Legal side: because we did not grant that authorization.
[18:13.9–18:17.3] Mixed or uncertain speakers: - Okay, so if there was a situation where,

[18:17.3–18:20.6] Caller: I mean, I know honeypot's not the love word to say

[18:20.6–18:22.7] Caller: but it's called stay to stay there.

[18:22.7–18:25.0] Caller: If there was a situation where we took these images

[18:25.0–18:28.8] Caller: we owned and you know, let's say I set up a website,

[18:28.8–18:32.1] Caller: Chris's Photos, put up 10,000 of them.

[18:32.1–18:35.4] Caller: That's not an issue for you even if it's a little bit

[18:35.4–18:37.9] Caller: naughty in how we might be trying to get people

[18:37.9–18:39.2] Speaker unclear: to use the photos but that's not the problem

[18:39.2–18:41.5] Speaker unclear: for you guys, right?

[18:41.5–18:46.6] Mixed or uncertain speakers: - Well, I would say if you are just putting the images

[18:47.0–18:49.8] CopyCat Legal side: on display on your website or on social media

[18:49.8–18:54.2] CopyCat Legal side: and someone happens to copy them or screenshot them

[18:54.2–18:57.7] CopyCat Legal side: and you didn't do that, you didn't authorize them

[18:57.7–19:00.9] CopyCat Legal side: to do that, I would say that's just a typical infringement

[19:00.9–19:04.3] CopyCat Legal side: and that is something that we kind of just handle

[19:04.3–19:05.4] Mixed or uncertain speakers: on the daily.

[19:05.4–19:10.0] Speaker unclear: If there's another instance that for some reason [Check audio: transcription passes differed at this boundary]

[19:10.0–19:16.8] Mixed or uncertain speakers: reason there is a reason to take it. We're not telling people to do it, but [Check audio: transcription passes differed at this boundary]

[19:16.8–19:21.4] Speaker unclear: but you know I mean there is like the whole you know is this a honey pot is

[19:21.4–19:26.1] Speaker unclear: there's not a honey pot kind of thing and I mean it is I guess by a little bit

[19:26.1–19:34.5] Speaker unclear: of definition but that's acceptable right? Don't call it that. If it's on

[19:34.5–19:39.5] CopyCat Legal side: display on your website that still doesn't mean that someone can just use

[19:39.5–19:43.2] CopyCat Legal side: it without your permission just because there's a cereal box at Walmart that you

[19:43.2–19:46.7] Mixed or uncertain speakers: can look at doesn't mean that you can just take it. So if it's just on

[19:46.7–19:52.2] CopyCat Legal side: display I would say that's probably just the right of the

[19:52.2–19:55.7] CopyCat Legal side: photographer or your you know the authorized agent to display it for

[19:55.7–19:59.8] CopyCat Legal side: advertising or anything like that but if it's on your website that hey all

[19:59.8–20:02.8] CopyCat Legal side: images are licensed or sometimes we have clients to have watermarks on their

[20:02.8–20:07.1] CopyCat Legal side: images or even just a disclaimer anywhere or you know it's just a

[20:07.1–20:10.1] CopyCat Legal side: general rule that you probably shouldn't take things that don't belong to you.

[20:10.1–20:15.8] CopyCat Legal side: So I don't I don't feel as being an issue but again if you want to have like

[20:15.8–20:18.7] CopyCat Legal side: a further consultation call with one of our attorneys that is definitely legal

[20:18.7–20:22.9] Mixed or uncertain speakers: question. Okay. If you want more clarification on that. Okay so that's not

[20:22.9–20:27.3] Mixed or uncertain speakers: you know that's not a huge you know issue for you guys and also I mean you

[20:27.3–20:32.4] Speaker unclear: guys you guys ever get that accusation with the other clients? Oh yeah it's a

[20:32.4–20:39.2] CopyCat Legal side: very common kind of reflex I think if you know you're a lot of these business

[20:39.2–20:41.9] CopyCat Legal side: owners this is their first time hearing about a copyright infringement something

[20:41.9–20:45.5] CopyCat Legal side: like that it's just not something that everyone's familiar with and it's just

[20:45.5–20:50.4] CopyCat Legal side: a very reflex argument to be like oh you guys are not able to do this so

[20:50.4–20:54.5] CopyCat Legal side: we've never heard of this. It was available for free online the image is

[20:54.5–20:58.7] CopyCat Legal side: just you know a picture of a product it's really not that special I can

[20:58.7–21:01.6] CopyCat Legal side: find a million like them okay well you didn't use that one you use the

[21:01.6–21:05.9] CopyCat Legal side: specific one which is our clients so that is the issue there yeah we've got

[21:05.9–21:12.3] CopyCat Legal side: we've gotten all types of responses all day so it's not really an issue yeah

[21:12.3–21:17.4] CopyCat Legal side: yeah there was a firm that also we were talking to where they you know brought

[21:17.4–21:20.9] Caller: up the idea of strategically placing images saying they own a series of

[21:20.9–21:24.2] Caller: websites we would give them the rights to do it and then they would you know

[21:24.2–21:28.5] Caller: further use software to track that so you know like I mean that that is where

[21:28.5–21:32.3] Caller: we kind of definitely talk into the once again the naughty category that

[21:32.3–21:35.7] Caller: that's but once again you're fine to represent us if we're doing that right

[21:35.7–21:43.6] CopyCat Legal side: um yeah I would say we have a lot of clients that use software to track the

[21:43.6–21:49.5] CopyCat Legal side: infringements like there are agencies out there some image rights pixie things

[21:49.5–21:54.6] CopyCat Legal side: like that and that's they offer that service where photographers just enter

[21:54.6–21:58.6] CopyCat Legal side: there they just upload their images and then that software company agency just

[21:58.6–22:02.9] CopyCat Legal side: kind of just runs a search like constantly looking for infringements and

[22:02.9–22:06.7] CopyCat Legal side: I that's totally something that we see all the time so that doesn't sound

[22:06.7–22:11.1] CopyCat Legal side: unusual okay so you know if there's a situation like just don't call it a

[22:11.1–22:19.7] CopyCat Legal side: honeypot right I'll leave it at that yeah there we go just don't call it

[22:19.7–22:23.8] Mixed or uncertain speakers: sometimes it's a spade enough to call um the other thing I also just have and I

[22:23.8–22:29.2] Caller: guess this is the final question do you guys ever evaluate the images you guys

[22:29.2–22:33.1] Caller: are getting so what I mean by that is like I'll be honest with you well we

[22:33.1–22:38.1] Caller: have being sent to us I would say 95% of the photos are job where you know I'm

[22:38.1–22:41.7] Caller: talking like you know we'll see like we'll see Celine Dion's chin coming out

[22:41.7–22:46.4] Caller: of a limo that a photographer sent in and sold you guys like is it just like

[22:46.4–22:50.1] Caller: if they're ever a situation where there's like a quality standard on the

[22:50.1–22:57.8] Mixed or uncertain speakers: photos I wouldn't say there's a typical quality standard in that sense it's

[22:57.8–23:03.2] CopyCat Legal side: more so does is this image the image that was used so it's more does it

[23:03.2–23:09.1] CopyCat Legal side: match our clients image um so if it looks like you can't really see our

[23:09.1–23:13.2] Mixed or uncertain speakers: clients image or it looks like it it could be but it's been you know warped

[23:13.2–23:16.5] CopyCat Legal side: around or something like that maybe that's the the quality inspection that

[23:16.5–23:22.0] CopyCat Legal side: we would look at but the type of photo is not exactly something that comes up

[23:22.0–23:29.0] CopyCat Legal side: a lot in our in our initial review really okay if it's yeah it's more so

[23:29.0–23:33.4] CopyCat Legal side: is that our clients image can we confidently say that it's the same that

[23:33.4–23:38.1] CopyCat Legal side: it was infringed can you see it is it available is it on a commercial site

[23:38.1–23:42.3] CopyCat Legal side: was the use commercial so it's more like the the legal considerations kind

[23:42.3–23:45.1] CopyCat Legal side: of come in there well we have a lot of photojournalists we have a lot of

[23:45.1–23:50.8] CopyCat Legal side: product of photographers as well that are just food photographers so they can

[23:50.8–23:54.4] CopyCat Legal side: be you know we see like very general photos not they're not always

[23:54.4–23:59.4] CopyCat Legal side: magnificent but you know they're they're the photographers work so we

[23:59.4–24:02.9] Mixed or uncertain speakers: try us with that okay I guess actually I forgot I forgot there's a you know I

[24:02.9–24:06.3] Caller: guess two final questions and the first one is just simple what what is your

[24:06.3–24:11.2] Speaker unclear: email just so I can reach out again yeah of course um so my email is going

[24:11.2–24:23.2] Mixed or uncertain speakers: to be Alyssa at copycatlegal.com so that's a L Y S A copy legal .com 1L or

[24:23.2–24:29.9] Speaker unclear: 2L oh 1L okay alright thank you and the next one and this is final final one

[24:29.9–24:33.1] Mixed or uncertain speakers: and I you know I got a few more calls with similar firms to do but they've

[24:33.1–24:35.8] Caller: got this one give you guys a little bit of an edge because the previous one

[24:35.8–24:41.0] Caller: didn't answer this what is the largest settlement you guys have done so far if

[24:41.0–24:44.5] Caller: you can disclose you don't have to say which client because I asked a previous

[24:44.5–24:47.5] Caller: one that and they were not willing to say what their largest settlement was

[24:47.5–24:51.2] Caller: because you know they were this company was saying oh yeah we can if somebody's

[24:51.2–24:55.2] Caller: using this number we can you know sue them and get like a million dollars and

[24:55.2–24:57.9] Caller: they're telling you know all these things are saying oh yeah we send out

[24:57.9–25:01.5] Caller: this form for a quarter million but I asked them is like well how many what's

[25:01.5–25:04.5] Caller: the biggest settlement they refused to answer could you give a little bit more

[25:04.5–25:07.9] CopyCat Legal side: of a firm answer on that and I'm not gonna hold you to it it could be a

[25:07.9–25:13.6] CopyCat Legal side: guesstimate yeah no worries um so I gotta say off the top of my head I

[25:13.6–25:17.6] CopyCat Legal side: genuinely don't know I would have to like look at our records just

[25:17.6–25:21.6] CopyCat Legal side: throughout the different years through litigated cases pre-litigated cases the

[25:21.6–25:26.5] CopyCat Legal side: amount of photos in the case also raised the demand a lot so I would if I

[25:26.5–25:30.1] CopyCat Legal side: had a guess I'd say it was one that had a lot of photos in it and I would say

[25:30.1–25:32.6] Mixed or uncertain speakers: it's one that all those photos are registered with a copyright office

[25:32.6–25:36.9] CopyCat Legal side: beforehand Oh couldn't tell you off the top of my head but I would say it's

[25:36.9–25:43.6] Speaker unclear: definitely one of those isn't over a hundred thousand settlements a hundred

[25:43.6–25:52.2] Mixed or uncertain speakers: thousand dollars um I gotta say don't know I can't give you a hard number I'm

[25:52.2–25:56.8] CopyCat Legal side: gonna say it might be around that many figures but I couldn't give you a hard

[25:56.8–26:01.6] CopyCat Legal side: number there oh okay so there so yeah I can so basically you know when these

[26:01.6–26:04.9] Mixed or uncertain speakers: companies are kind of telling me oh yeah you know I'll send out forms for

[26:04.9–26:09.1] Caller: you guys for half a million if they infringe or whatever using that I think

[26:09.1–26:13.6] Mixed or uncertain speakers: we can kind of guess like alright we're gonna ask for that but then if we shrink

[26:13.6–26:21.1] Mixed or uncertain speakers: that number 90% you know we'll take it sometimes that's fair to say all right

[26:21.1–26:24.2] Caller: cool well thank you very much I'll be back in touch through email in the next

[26:24.2–26:27.6] Caller: few days and you know if there's like there's gonna be a few more numbers I

[26:27.6–26:30.4] Caller: want to know once again you know nothing you don't have to disclose any

[26:30.4–26:33.8] Caller: clients information but would just be kind of wonderful to know a little bit

[26:33.8–26:37.8] Caller: more and from there I guess the process would be just you know how would the

[26:37.8–26:44.3] Speaker unclear: process go like when can we start work yeah so um if I can actually get your

[26:44.3–26:47.6] CopyCat Legal side: the best email to reach you out and the best phone number to reach you out just

[26:47.6–26:53.6] CopyCat Legal side: for future use that'd be great if you have an email that that would work best

[26:53.6–26:59.8] CopyCat Legal side: for you yes it's like it's Chris at fresco but media.com but the thing is

[26:59.8–27:02.9] Mixed or uncertain speakers: we're actually changing the domains on that so can I shoot you an email in the

[27:02.9–27:10.4] Mixed or uncertain speakers: next few hours yeah sure no worries okay and then the number I have here let me

[27:10.4–27:13.2] CopyCat Legal side: know if it's correct because I think it might be too many digits on my screen

[27:13.2–27:20.1] Mixed or uncertain speakers: here but I have 315-417-3794 I'm using a phone number through my laptop

[27:20.1–27:23.4] Mixed or uncertain speakers: right now it's just a little bit easier managing everything I'll send I'll send

[27:23.4–27:26.7] Caller: you all my information website as well cuz we're doing a whole rebranding

[27:26.7–27:30.9] Caller: because if you look up the company Fresco so this company was actually

[27:30.9–27:35.6] Caller: around ten years ago Ashton Kutcher and Celine Dion invested in it the company

[27:35.6–27:39.3] Caller: went belly up with the old owner we bought the rights and also a lot of the

[27:39.3–27:42.9] Caller: images they used back in the day and we're kind of refreshing everything and

[27:42.9–27:46.8] Caller: we might we might actually change the name because the original founder had a

[27:46.8–27:51.0] Mixed or uncertain speakers: little bit of a yeah we'll not talk about that story he had a little bit of

[27:51.0–27:56.1] Speaker unclear: a he had a little bit of a confused he took COVID a little hard and I mean

[27:56.1–27:59.2] Speaker unclear: actually just quick thing he you know was involved in a scandal where he

[27:59.2–28:05.7] Speaker unclear: tried burning down his own apartment in Austin Texas in like 2020 so he was a

[28:05.7–28:13.0] Speaker unclear: weird guy they was like no we I knew him too back in the day but yeah so that

[28:13.0–28:19.7] Speaker unclear: was the case but all right so I guess we're probably not gonna use that name

[28:19.7–28:23.2] Speaker unclear: it was just it was more on the place the software was actually still good

[28:23.2–28:26.9] Caller: like there was a lot of good software the company did and then also at the

[28:26.9–28:31.0] Caller: same time like the image catalog is actually huge like there was a point

[28:31.0–28:35.4] Caller: where just in Alaska alone their biggest newspaper was exclusively using

[28:35.4–28:39.7] Mixed or uncertain speakers: them for a year to get images all right well by the way thank you very much

[28:39.7–28:43.7] Speaker unclear: we'll be in touch yeah of course I hope to hear you soon

[End of recording at 28:45.2]